1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re SILICON STORAGE TECHNOLOGY. INC. SHAREHOLDER DERIVATIVE LITIGATION | Case Number C 06-3359 JF (RS) **ORDER[1] RE MOTIONS TO DISMISS** RE: Docket Nos. 79, 83, 85 |

## I. BACKGROUND

In this shareholder derivative action, Plaintiffs Mike Brien and Behrad Bazargani ("Plaintiffs") allege that a number of directors and officers of Nominal Defendant Silicon Storage Technology, Inc. ("SSTI") engaged in and concealed a pattern of options backdating, thereby diverting large amounts of corporate cash to the option grantees. Plaintiffs allege that the directors violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and that both they and a number of corporate officers violated various provisions of California law. Both of Plaintiffs' later-consolidated complaints were filed after the company admitted that a large number of options had been "mispriced" from 1997 through 2005.

---

[1] This disposition is not designated for publication in the official reports.

Specifically, in the midst of allegations of widespread options backdating in the high-tech industry, the company initiated a voluntary and purportedly independent investigation. The investigation revealed a consistent practice of "grant[ing] stock options with an exercise price based upon the lowest closing price of our common stock in the month of hire, promotion or merit increase," and "delay[ing] the selection of [grants to newly-hired employees] until the end of a three-month period in the fiscal quarter during which the employees who received the grants began their employment or received their promotion or merit increase." Nonetheless, after "carefully consider[ing] the involvement of current members of management and the board of directors in the stock option grant process," the chairman of the investigation "concluded that they were either unaware of the methods by which the exercise price for such options was determined and/or that such exercise price would have a financial impact." After reviewing the results of the investigation, the SEC notified SSTI that it would not be pursuing an enforcement action.

SSTI moves to dismiss the complaint on the ground that Plaintiffs lack standing to pursue a derivative action because (1) they have failed adequately to allege contemporaneous and continuous ownership of SSTI stock, and, (2) having declined to make a demand that the corporation pursue the litigation, they have failed adequately to allege the futility of such a demand. The directors and officers move to dismiss on the ground that the allegations in the operative Second Amended Complaint ("SAC") fail on the merits to state a claim upon which relief may be granted.

Courts generally consider the issue of demand futility before reaching the merits. In the instant case, however, several factors suggest that it will be most expeditious for the Court to reserve a ruling on demand futility and to pass preliminarily on the merits of the claims. Where "there are allegations that a majority of the board that must consider a demand acted wrongfully," the focus for purposes of demand futility is on whether "the directors face a 'substantial likelihood' of personal liability, [such that] their ability to consider a demand impartially is compromised" and demand is excused. *Guttman v. Huang*, 823 A.2d 492, 500

2

(Del. Ch. 2003).[2] In the instant case, the complaint contains precisely such allegations, meaning that the issue of demand futility will turn principally on the extent to which the directors and officers may face liability for their allegedly wrongful conduct. At the same time, a careful review of Plaintiffs' complaint reveals numerous factual inconsistencies in the pleading of allegedly backdated options that give rise to their claims, such that while Plaintiffs at some point may be able to state a viable claim, they have not yet done so. Under these circumstances, Plaintiffs will be given an opportunity to revise or clarify their allegations so that the Court may assess more accurately the extent of Defendants' potential liability for purposes of demand futility.

## I. BACKGROUND

Plaintiffs have named the following current and former directors as defendants in this action (collectively, "the Director Defendants"): Bing Yeh ("Yeh"), who has been President, CEO, and Director since 1989 and Chairman of the Board since 2004, and who was a member of the Compensation Committee between 1997 and 2004; Yaw-Wen Hu ("Hu"), who held various vice presidencies and senior vice presidencies between 1993 and 2004, and who has been Executive Vice President and Chief Operating Officer since 2004 and Director since September 1995; Tsuyoshi Taira ("Taira"), who was a Stock Option Compensation Committee member between 1997 and 2004, and who has been an Outside Director since July 1993, a Compensation Committee member since 1997, and an Audit Committee member since 1997 ; Yasushi Chikagami ("Chikagami"), who was a member of the Stock Option Compensation Committee between 1997 and 2004, and who has been an Outside Director since September 1995, a Compensation Committee member since 1997, and an Audit Committee member since 1997; Ronald Chwang ("Chwang"), who was a member of the Stock Option Committee between 1999 and 2004, and has been an Outside Director since June 1997, a Compensation

---

[2] Although SSTI is a California corporation and California law therefore applies, California courts generally look to Delaware law in assessing whether demand futility has been pled adequately. *See Oakland Raiders v. Nat'l Football League*, 93 Cal. App. 4th 572, 586 n.5 (2001).

Committee member since 1998, and an Audit Committee member since 1998; and Terry M. Nickerson ("Nickerson"), who has been an Outside Director and member of the Audit and Compensation Committees since April 18, 2005.

Plaintiffs allege the following with respect to the directors:

Yeh, as a member of the Non-Officer Stock Option Committee ("NOSOC"), (a) "deliberately backdated stock option grants to dates other than when the stock option recipient commenced their [sic] employment with the Company in order to coincide with historically low Silicon Storage stock prices," and (b) allegedly received backdated options with measurement dates of January 11, 1999, January 6, 2000, January 16, 2001, and January 22, 2002.[3]

Hu allegedly received backdated stock options while serving as a director. Hu is not alleged to have served on any committee that granted options, or to have been involved otherwise in the granting of options. Nonetheless, he is alleged to have "knowingly and deliberately" signed the Company's allegedly false financial statements.

Nickerson, who did not join the Board until 2005, (a) served on the Compensation Committee during 2005 and allegedly approved a backdated stock option grant, and (b) approved and signed false SEC filings.

Chikagami, who has served on the Board since 1995, allegedly (a) received backdated stock option grants dated August 31, 1998 and June 28, 2004, which did not coincide with the annual shareholder meeting, as required by the SSTI stock plans, (b) served on the Stock Option and Compensation Committees between 1997 and 2004 and purportedly approved backdated option grants, (c) approved and signed false SEC filings, and (d) sold shares of SSTI stock during the "Relevant Period."

Chwang, a member of the Board since 1997, allegedly (a) received stock option grants dated August 31, 1998 and June 28, 2004, which purportedly were illegal for the reasons given immediately above with respect to corresponding grants to Chikagami, (b) served on the Stock

---

[3] While Plaintiffs allege that Yeh received backdated options and sold SSTI stock, they do not allege that he sold any backdated options, and it appears that he realized no profit from the sale of any backdated or "mispriced" options.

Option and Compensation Committees between 1997 and 2004 and supposedly approved backdated option grants, and (c) approved and signed false SEC filings.

Taira, a member of the Board since 1993, allegedly (a) received a stock option grant dated June 28, 2004 that allegedly was improper for the reasons given above, (b) served on the Stock Option and Compensation Committees between 1997 and 2005 and supposedly approved backdated option grants; (c) approved and signed false SEC filings; and (d) sold shares of SSTI stock during the "Relevant Period."

Plaintiffs also have named the following current and former officers as defendants to their state-law claims (collectively, "the Officer Defendants"): Derek Best ("Best"), who was SSTI's Vice President of Sales and Marketing between June 1997 and June 2000, and who since 2000 has served as the company's Senior Vice President of Sales Marketing; Michael Briner ("Briner"), who previously served as Vice President of Products, Vice President of Engineering, and Senior Vice President of the Application Specific Products Group, and who currently serves as Senior Executive Advisor of Technology; Isao Nojima ("Nojima"), who at various times between March 1993 and April 2005 held multiple vice presidencies and senior vice presidencies; Chen Tsai ("Tsai"), who since October 2004 has been Senior Vice President, Worldwide Backend Operations; Jeffrey Garon ("Garon"), who was SSTI's CFO between 1998 and 2004; Paul Lui ("Lui"), who has held several vice presidencies since 1999; and Arthur Whipple ("Whipple"), who served as the company's controller from March 2005 until January 1, 2006, and as its Vice President of Finance, CFO, and Secretary from January 2006 until February 2007. Plaintiffs allege that the Officer Defendants participated in a scheme to backdate options, knowingly received backdated options, and exercised those options at a profit.

## II. LEGAL STANDARD FOR DISMISSAL PURSUANT TO RULE (12)(b)(6)

A complaint may be dismissed for failure to state a claim upon which relief may be granted for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984). For purposes of a motion to dismiss, all allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party.

*Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994). A complaint should not be dismissed "unless it appears beyond doubt the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Clegg*, 18 F.3d at 754. In addition, leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corrs.*, 66 F.3d 245, 248 (9th Cir. 1995). Conversely, dismissal may be ordered with prejudice when amendment would be futile. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

### III. DISCUSSION

#### A.    Section 10(b) claims

To state a claim under §10(b) and Rule 10b-5, Plaintiffs must allege (1) a material omission or misrepresentation, or the use of a manipulative or deceptive device or contrivance, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Plaintiffs must meet the particularity requirements of Fed. R. Civ. P. 9(b), *In re Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005), and must plead Defendants' scienter with particularity as required by the PSLRA, *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, __ U.S. __, 127 S.Ct. 2499, 2508 (2007) (holding that the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"). Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, n.12 (1976). To determine whether Plaintiffs have alleged facts giving rise to a "strong inference" of scienter, the Court must consider both (1) plausible non-culpable explanations for Defendants' conduct; and (2) inferences favoring the Plaintiffs. *Tellabs*, 127 S.Ct. at 2510. Evidence of scienter must be more than merely "reasonable" or "permissible"; it must be "cogent" and "at least as compelling as any opposing inference one could draw from the facts alleged." *Id*.

#### 1. Statute of limitations

Under the Sarbanes-Oxley Act ("SOX"), claims for violations of § 10(b) may not be

6

brought more than five years after the date of the violation. 28 U.S.C. § 1658(b)(2). The five-year period is a statute of repose, meaning that equitable tolling is unavailable. *See In re Zoran Corp. Deriv. Litig.*, 511 F. Supp. 2d 986, 1013-14 (N.D. Cal. 2007). Each false representation constitutes a separate violation of § 10(b), such that the five-year period begins to run with respect to each violation when it occurs. *Id.* at 1014. Where the alleged wrong is options backdating, the violation occurs at the time the backdated option grant is made. *In re Marvell Tech. Group Ltd. Sec. Litig.*, No. C-06-06286 RMW, 2008 WL 4544439, at *11 (N.D. Cal. Sept. 29, 2008); see also *In re Affiliated Computer Servs. Deri. Litig.*, 540 F. Supp. 2d 695, 701 (N.D. Tex. 2007).

Plaintiffs' first complaint was filed on July 13, 2006. Accordingly, claims with respect to any options that allegedly were backdated before July 13, 2001 are time-barred. Thirteen of the twenty-two grants that Plaintiffs allege to have been backdated were made prior to that date. The time-barred grants are those made on the following dates: April 28, 1997; March 17, 1998; July 6, 1998; August 31, 1998; January 11, 1999; June 7, 1999; July 1, 1999; September 24, 1999; January 6, 2000; June 29, 2000; August 2, 2000; January 16, 2001; and March 29, 2001. SAC ¶¶ 61-107.[4]

### 2. Material misstatements or omissions

A fair reading of Plaintiff's complaint and an assessment of Defendants' responsive arguments plausibly suggests that at least some backdating occurred at SSTI. If options were backdated, SSTI's representations in its financial statements that options were granted consistent with the applicable stock options plans–each of which required that grants be priced at the fair market value of SSTI stock on the day of the grant–were false or misleading, and potentially violated § 10(b). The allegedly false or misleading statements also would have been material: while Plaintiffs do not offer a year-by-year breakdown of the additional compensation costs, tax penalties, or other financial obligations attributable to the backdating, the company did issue a

---

[4] The statute of limitations analysis for claims under § 20(a) is the same as for claims under § 10(b). *See In re Heritage Bond Litigation*, 289 F. Supp. 2d 1132, 1148 (C.D. Cal. 2003). Thus, the time-barred options also may not support Plaintiff's § 20(a) claim.

$41 million restatement in 2006, largely as a result of the backdating. However, only option grants made after July 13, 2001 may serve as the basis of Plaintiffs' federal claims. While the Court will evaluate Plaintiffs' pleading of all of the alleged backdating in order to provide a complete picture of Defendants' alleged misconduct, the allegations with respect to all but the first of the timely-alleged grants are factually deficient, as discussed below.[5]

### a. 1997 grants

Plaintiffs allege that Chikagami, Chwang, and Taira made option grants to Nojima, Hu, and Tsai on April 28, 1997, which "coincided with one of the lowest closing prices of the fiscal quarter and month." SAC ¶ 65. However, as Plaintiffs concede, they have omitted two other grants during 1997, including one that "was made at one of the highest closing prices of the month". *See* SAC ¶ 63. Without an analysis of the number and size of surrounding grants, the imprecise statement that the measurement date corresponded to "one of the lowest closing prices of the fiscal quarter and month," combined with the lack of context, is insufficient to support the inference that the option was *intentionally* backdated, much less that the individual members of the SOC were directly responsible for such backdating. "[M]erely alleging that options were granted at a periodic low in stock price that was followed by a sharp jump in price [is] not sufficient to plead a pattern of backdating. More facts, including how often and at what times past stock options were granted, [are] needed to show a pattern. *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 958 (N.D. Cal. 2007) (citing *In re Linear Tech. Corp. Deriv. Litig.*, No. C-06-3290 MMC, 2006 WL 3533024 at *3 (N.D. Cal. Dec. 7, 2006)). Here, the date of the grant was not even followed by a "sharp jump" in price. *See* SAC ¶ 63.

### b. 1998 grants

Plaintiffs identify three grants allegedly made by the SOC, comprised of Chikagami, Chwang, and Taira. One of these grants, dated April 28, 1998, merely is labeled as "backdated"

---

[5] As explained below, the Court will defer its determination as to whether to exercise supplemental jurisdiction over Plaintiffs' state-law claims until such time as Plaintiffs have stated a viable federal claim. Accordingly, the Court will not discuss the state-law claims at this time or opine as to whether or how the pre-July 2001 options grants may be relevant.

8

in the complaint, without any explanation. *See* ¶ 70 (table). A second grant is dated July 6, 1998, which allegedly "coincided with the second-lowest closing price of the month and immediately preceded a large spike in the Company's stock price." SAC ¶ 73. As with the 1997 grant, this boilerplate allegation is insufficient without further context. Nor does the available context aid Plaintiffs. While Plaintiffs do allege that a third grant made to the directors and dated August 31, 1998 was not issued on the day of the company's annual meeting as required by the relevant stock plan, the Court may not assume that intentional backdating occurred merely because the grant was not issued on the day of the annual shareholder meeting and had a strike price that was $0.63 lower than it would have been if issued on the correct date. This pleading deficiency is discussed more fully *infra* at Section III.A.3.a.

Plaintiffs also identify a grant made by the NOSOC, comprised of Yeh, to Garon on March 17. Plaintiffs allege that the grant was backdated intentionally because the measurement date corresponded to the lowest closing date of the month, and because the company "admitted" in its 2006 10-K filing that the grant was made using hindsight. Plaintiffs, however, allege no facts going to the question of whether Yeh intentionally backdated this or any other grant. While they rely on the company's "admission" of backdating, they ignore the Audit Committee's "carefully considered" conclusion that the "current members of management and the board of directors in the stock option grant process . . . were either unaware of the methods by which the exercise price for such options was determined and/or that such exercise price would have a financial statement impact . . . ." *See* Litvinoff Decl., Ex. A, at Item 7. "Plaintiffs are not entitled to pick and choose which of [D]efendants' statements in public documents favor them and have all others ignored." *CNET*, 483 F. Supp. 2d at 966.

### c. 1999 grants

Plaintiffs point to four allegedly backdated 1999 grants, three made by the SOC, with measurement dates of January 11, June 7, and July 1, and one made by the NOSOC, with a measurement date of June 7. The January 11 grant is alleged to have been made on a date "which coincided with the lowest price of the week in which the grant was made, . . . and immediately preceded a significant spike in the Company's stock price." SAC ¶ 82. Plaintiffs

9

allege that the June 7 grant "coincided with the lowest closing price of the month." SAC ¶ 84. Finally, Plaintiffs allege that the July 1 grant "coincided with the lowest price of the half-year." ¶ 86. Defendants do not specifically challenge the allegations with respect to any of the grants made in 1999, except generally to attack Plaintiffs' "lack of methodology" and failure to account for "innocent" explanations of the option grant dates, such as the possibility that the grant occurred on the first or last day of the month. The Court agrees that it is doubtful whether an allegation that a grant was made during the lowest price point of a particular week has any meaning without considerably more statistical analysis than is present here. However, with respect to the remainder of the grants made by the SOC, Defendants have not carried their burden of demonstrating that their motion should be granted.

With respect to the non-officer grant dated June 7 grant, Plaintiffs state that the grantee, Lui, began working at the company on Friday, June 4, 1999, when the stock price was $4.66 per share, but that the NOSOC "waited until a date after June 4, 1999"–in fact, until Monday, June 7, 1999–to grant the options, at which time the stock price was $4.63 per share. SAC ¶ 85. Neither the timing of the grant nor the fact that the price of the company's stock on June 7 was three cents lower than on the previous business day constitutes a well-pleaded fact giving rise to an inference of intentional backdating by Yeh. Indeed, the pleaded facts suggest nothing more than administrative error.

### d. 2000 grants

Plaintiffs identify three allegedly backdated grants approved by the SOC in 2000. The purported grant dates were January 6, June 29, and August 2, which coincided with the lowest price of the respective year, month, and quarter in which the grants were made. In total, the challenged grants comprise 637,545 options. While they object generally to Plaintiffs' methodology, Defendants appear to have no specific objections to the labeling of any of these grants as backdated.

### e. 2001 grants

Plaintiffs challenge three grants approved by the SOC in 2001. The grants bear dates of January 16, March 29, and October 1. Plaintiffs allege that the January 16 grants "coincided

10

with the lowest closing price of the week." Beyond the Court's earlier-expressed doubts as to

the significance of isolated grants on dates coinciding with the lowest price of the week,

Defendants point out that while the grant date for the January 16 option was set for the Tuesday

after the 2001 Martin Luther King, Jr., holiday, the strike price properly was calculated based on

SSTI's closing price on the Friday before the three-day weekend, which was *higher* than the

price on the following Tuesday. The Court agrees that the allegations of backdating with respect

to this grant are flawed. With respect to the two other options identified in 2001, however,

Plaintiffs allege that the measurement dates coincided with the "lowest closing price of the

quarter," SAC ¶ 106 (the March 29 grant), and the "second-lowest closing price of the quarter,"

SAC ¶ 108 (the October 1 grant). Defendants appear to have no specific objection to the

pleading of these backdated grants.

### f. 2002 grants

Plaintiffs challenge two grants approved by the SOC in 2002, dated January 22 and

October 15. The allegations regarding the first grant suffer from the same inaccuracies as those

pertaining to the grant dated January 16, 2001. The strike price of the January 22 grant properly

was calculated based on SSTI's closing price on the Friday before the three-day weekend, which

was higher than the price on the following Tuesday. In fact, the strike price for the January 22,

2002 grant was higher than any other price on the four days following the holiday weekend. In

addition, with respect to the October 15 grant, Defendants note that they filed Form 4s on

October 16, 2002, the day after the stock option grant.[6] This fact makes it "highly unlikely that

defendants could have gone back in time to change the date for this grant if it was on record

with the SEC [one] day[] after the fact." *CNET*, 483 F. Supp. 2d at 961. Indeed, Plaintiffs

---

[6] Defendants request that the Court take judicial notice of these filings. Plaintiffs argue that judicial notice is improper, and that the Court essentially should ignore the filings. Plaintiffs, however, refer in their complaint to the subject Form 4 filings (albeit to their absence), and the Court may consult documents referred to in the complaint. In *CNET*, the court took judicial notice of the filing dates for Form 4s and found that the defendants' timely filing of the forms diminished or eliminated any inference of intentional backdating. *See CNET*, 483 F. Supp. 2d at 961.

elsewhere specifically exclude grants that were disclosed on a Form 4 within the required time period. *See* ¶ 128 n.11.

### g. 2003 grants

Plaintiffs challenge two grants approved in 2003, with measurement dates of January 20 and October 1. With respect to the January 20 grant, Plaintiffs allege that the date coincided with "historical lows of fiscal year 2003." SAC ¶ 128. However, as discussed above, this imprecise allegation does not eliminate the possibility that the grant occurred when the company's stock price was well above the low point of *other* relevant reference periods. More importantly, while Plaintiffs again claim that the grant was not disclosed until the following year, the Court takes judicial notice of the Form 4 filed by the grantee–Yeh–only two days after the grant, again undermining the inference that backdating occurred.

With respect to the October 1 grant, Plaintiffs appear to have engaged in "cherry-picking," having excluded no fewer than four concededly proper grants made in 2003. While generally speaking "plaintiffs are not to be faulted if they bring suit challenging such 'cherry-picked' option grants as appear to have been the product of backdating[,] . . . [since] Defendants need not have backdated all options grants to face liability," *In re PMC-Sierra, Inc. Deriv. Litig.*, No. C 06-05330 RS, 2007 WL 2427980, at *4 (N.D. Cal. Aug. 22, 2007) (citing *CNET*, 483 F. Supp. 2d at 961), this "methodology" has not been viewed favorably, *see, e.g.*, *In re Openwave Systems Inc. S'holder Deriv. Litig.*, 503 F. Supp. 2d 1341, 1350 (N.D. Cal. 2007) ("[I]n a set of 40 option grants, two fell on monthly lows, one fell on a quarterly low, and seven fell on one of the lowest monthly prices, [a pattern which is] as consistent with a random selection of stock option grant dates . . . as with a pattern of backdating."). Plaintiffs' selective allegations, which lack factual particularity, are insufficient to raise an actionable inference that Defendants knowingly participated in backdating.

### h. 2004 grants

Plaintiffs challenge two grants made in 2004. The first was made to Chikagami, Chwang, and Taira, and was dated June 28. Similar to the August 31, 1998 grant, and as discussed in more detail *infra* at Section III.A.3.a, the allegations with respect to the June 28

12

grant do not withstand scrutiny. The allegations with respect to the second 2004 grant, which was made to Tsai, are equally flawed. There are, in fact, no allegations that the grant was backdated, and the graph of the company's stock price included in the complaint does not reveal any remarkable price characteristics near the measurement date. Plaintiffs assume that the options were backdated because Tsai did not disclose the grant until October 18, 2004. SAC ¶ 140. However, Tsai did not become a so-called section 16 reporting officer–and his disclosure duty therefore did not arise–until he was promoted to the position of Vice President of Worldwide Backend Operations in October 2004. SAC ¶ 30. Thus, the sole fact offered to support an inference of intentional backdating–namely, Tsai's failure timely to disclose the grant–does not suggest that backdating occurred.

### i. 2005 grants

Plaintiffs challenge two grants approved in 2005, one dated March 31 and approved by Yeh,[7] the second dated October 18 and approved by the Compensation Committee, which consisted of Chwang, Nickerson, and Taira. The latter grant is the only one implicating outside director Nickerson. Plaintiffs allege that "[t]he fact that the March 31, 2005 stock options were granted to Whipple on the last day of the fiscal quarter, and at the one [sic] of the lowest closing prices of the quarter, demonstrates that the NOSOC delayed the selection of the grant date until the end of the quarter during which Whipple began his employment with the Company . . . ." (SAC ¶ 147). However, while Plaintiffs allege that Whipple was hired as Controller in March 2005, they do not address the obvious possibility that Whipple began work on March 31, thus vitiating the inference of backdating. In addition, Plaintiffs' use of the "quarter" as their reference in this particular instance belies the fact that the March 31 closing price was the eleventh-lowest in the month of March 2005. Plaintiffs' recourse to different frames of reference may be consistent to some extent with the results of the company's internal investigation, which revealed that grant dates were selected to coincide with the lowest point in the relevant month or quarter, but Plaintiffs simply do not provide enough context to make their

---

[7] Whipple served as the Company's Controller from March 2005 until January 1, 2006.

13

theory of liability plausible. Indeed, Plaintiffs have excluded five options from their account of the company's grant practices in 2005. SAC ¶ 145 n.13.

With respect to the October 18 grant, the company reported in a Form 8-K that "[o]n October 19, 2005, Arthur O. Whipple was appointed Chief Financial Officer, effective January 1, 2006."[8] It is unsurprising that a stock option grant accompanied the promotion. It also is unsurprising that the strike price was set at the closing price for the previous day, since the strike price on the date of the grant would not have been known until after the market closed. These innocent explanations for the grant largely vitiate any inference of intentional backdating. *See CNET*, 483 F. Supp. 2d at 960 (rejecting plaintiff's allegations that "there was a runup in stock price after the grant date," and that the grant date coincided with a stock price that was the "lowest . . . in the month" or the "lowest . . . within a certain period of time," where the defendant rebutted the allegations with facts showing that the grants coincided with hiring and other corporate events). As Defendants observe, the fact that Whipple did not disclose the option until January 9, 2006 has little probative value since the effective date of his promotion was not until January 1, 2006, SAC ¶ 149, prior to which he had no obligation to report the grant.

### j. Analysis

The foregoing discussion reveals multiple defects in Plaintiffs' pleadings. As an initial matter, Plaintiffs' account of the backdated options is decidedly unsystematic and lacks the credibility of serious statistical analysis. In addition, multiple grants that Plaintiffs assume to be backdated or suspicious because the grants were not disclosed to the SEC actually *were* disclosed by the grantees, thus undermining the inference of intentional wrongdoing. More specifically, among the timely alleged grants, only the allegations of backdating with respect to the October 1, 2001 grant survive scrutiny, and even those allegations are open to question on

---

[8] The Court takes judicial notice of the Form 8-K attached as Exhibit A to Defendants' request for judicial notice.

14

the ground that Plaintiffs have not applied a reliable methodology to identify backdating.[9]  In any event, Plaintiffs would be well-advised to revisit their allegations of post-July 2001 backdating if they wish to rely on more than the single grant that appears unambiguously to have been backdated intentionally.

**3. Scienter**

Although Plaintiffs appear to have identified at least one clear instance of backdating as to which a § 10(b) claim might be timely, they fail to allege adequately that Defendants knowingly made or received backdated options grants, and therefore that Defendants acted with scienter in making material misrepresentations or omissions in the company's financial statements or elsewhere.

**a. Alleged receipt of backdated grants**

Well-pleaded allegations that Defendants knowingly received backdated options may support a strong inference of scienter.  *See, e.g.*, *City of Westland Police and Fire Ret. Sys. v. Sonic Solutions*, No. C 07-05111 CW, 2009 WL 942182, at *7 (N.D. Cal. April 6, 2009) ("While standing alone, the receipt of backdated options by individual Defendants does not necessarily support a strong inference of those Defendants' scienter, it does provide some support for that conclusion.").  In the instant case, Plaintiffs allege that Chikagami, Chwang, and Taira received backdated options granted on August 31, 1998 and June 28, 2004.  The 1998 grant was made to Chikagami and Chwang, while the 2004 grant was made to Chikagami, Chwang, and Taira.  Pursuant to SSTI's stock incentive plan, outside Board members received an automatic stock option grant on the date of the annual shareholder meeting.  Both of the challenged option grants were made after the respective shareholder meetings, which occurred on July 17, 1998 and June 4, 2004.

With respect to the 1998 grant, Plaintiffs allege that "Chikagami, Chwang, and Taira granted this grant on a date after the reported grant date and knowingly and deliberately used

---

[9] Despite the possibility that Plaintiffs' unsystematic approach to assessing the propriety of options grants undermines the inference of backdating generally, Defendants are encouraged to provide an option-by-option analysis of the allegations in any further motion briefing.

hindsight to pick the date and price when Silicon Storage's stock was near its quarterly low." SAC ¶ 76. The stock price differential between the date of the 1998 annual meeting and the date the grants were issued was $0.63. With respect to the 2004 grant, Plaintiffs allege that it was issued on a date other than the date of the annual meeting, when the price of the company's stock was $2.32 lower than the date of the meeting.

Plaintiffs' allegations are insufficiently particularized to raise a strong inference of knowing wrongdoing by the directors. Most importantly, the subject grants were "non-discretionary, automatic non-employee director stock option grant[s]." SAC ¶¶ 75 n.7, 138. No director action was required before the grants would be issued. All that was required was the execution of an administrative grant issuance process. While Plaintiffs assume that the directors intentionally manipulated the option grants, the Court simply "can infer nothing from the pled facts about whether and to what extent any director was involved in the mechanics by which the options were issued or the dates on which that administrative task was carried out." *Desimone v. Barrows*, 924 A.2d 908, 942 (Del. Ch. 2007). Moreover, the fact that Plaintiffs identify only two instances of improper non-discretionary grants having been issued during the nine-year "Relevant Period" supports the inference that the error was unintentional. Thus, the allegedly backdated grants to the directors do not create an inference that Chikagami, Chwang, and Taira acted with scienter when they signed company financial statements containing allegedly false representations about the options grant process.

### b. Alleged issuance of backdated grants

Plaintiffs' allegations that Defendants knowingly backdated options grants–and therefore acted with scienter in signing or approving materially false financial statements to be filed with the SEC–similarly are insufficient. Plaintiffs allege repeatedly that Defendants "knowingly and deliberately" backdated stock option grants or were "aware" that the grants were backdated. *See* SAC ¶¶ 54-58; 62; 69; 72; 74; 76; 80; 83; 85; 87; 89; 95;97; 99; 102; 105; 107; 109; 112; 115; 121; 124; 127; 130; 132; 135; 138; 140; 144; 149; 155; 165; 227; 231; 237; 239; 240; 243-45; 248-50; 254-56; 259). These allegations, however, are wholly conclusory. The most specific allegation of intentional wrongdoing by the directors is the following:

16

> Upon information and belief, Chikagami, Chwang, Nickerson, Taira, and Yeh, who granted stock option grants, would review historical stock prices before issuing stock options to select a grant date when the stock price was significantly below the current market price. They would then falsify the relevant documents to make it appear as if the stock options were granted on the earlier date.

SAC ¶ 58. There is not, however, a single particularized allegation of *fact* to corroborate this speculation. *See In re Maxim Integrated Prods., Inc., Deriv. Litig.*, 574 F. Supp. 2d 1046, 1063 (N.D. Cal. 2008) (finding allegations that directors approved backdated options and prepared false financial and proxy statements excessively broad and non-specific for purposes of establishing scienter).

With respect to each of the directors, the allegations are reducible entirely to the directors' membership on the relevant committees. *See* Pls.' Opp. at 17:22-26 ("The members of the NOSOC, SOC, and Compensation Committee were charged with a specific duty to administer the Plans and grant stock options in accordance with the requirements of the Plans. Their knowing failure to fulfill their duty, as demonstrated by the facts alleged in the Complaint, gives rise to a strong inference of scienter."). But committee membership, without more, falls far short of establishing that the directors acted with scienter in approving backdated grants. *In re Glenfed Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995) (holding that identification of directors' committee assignments and description of committees was insufficient to state a § 10(b) claim).[10] It is true that where, as here, the relevant stock option plans required that all

---

[10] *See also Verisign*, 531 F. Supp. 2d at 1207 (finding that conclusory allegations about committee membership are insufficient to raise strong inference of scienter); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1064 (C.D. Cal. 2008) ("Without more, the Court does not find membership on the Compensation Committee probative of scienter."); *In re Affiliated Computer Servics. Deriv. Litig.*, 540 F. Supp 2d 695, 701 (N.D. Tex. 2007) (holding that a defendant's position on compensation committee when backdated options were granted is insufficient to establish scienter); *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1157 (C.D. Cal. 2007) ("Plaintiff's failure to plead any facts related to the role or knowledge of any of the Individual Defendants or any Individual Defendant's involvement in the alleged backdating scheme is fatal to Plaintiff's showing of scienter."); *In re Marvell Tech. Group Ltd. Sec. Litig.*, No. C-06-06286 RMW, 2008 WL 4544439, at *9 (N.D. Cal. Sept. 29, 2008) (declining to find that defendant's "membership on the Executive Compensation Committee creates a strong inference of scienter on [his] part in the absence of specific allegations regarding his participation, even considering the magnitude of the backdating at [the company] found by

options be priced at the fair market value of the company's common stock on the date of the grant, "it is less likely . . . that the compensation committee could innocently or unknowingly authorize backdated options." *Conrad v. Blank*, 940 A.2d 28, 39 (Del. Ch. 2007). But that observation, while relevant in the context of demand futility, falls well short of demonstrating scienter. Rather, "even when backdating is 'almost certain,' claims against individual defendants must be dismissed unless the complaint provides 'adequate detail regarding their role and knowledge of the alleged backdating.'" *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1157 (C.D. Cal. 2007) (quoting *In re Atmel Corp. Deriv. Litig.*, 2007 WL 2070299, *6 (N.D. Cal. July 16, 2007)).

### c. Signing of allegedly false financial statements

The Court also notes that while a director's signing of SEC filings that contain false statements permits attribution of those statements to the director, *see Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061-63 (9th Cir. 2000), it does not establish that the director acted with scienter. *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 540 F. Supp. 2d 800, 825 n. 29, 813-14 (S.D. Tex. 2007) (explaining that the rule of *Howard*, which allows a court to assume that a signing defendant "made" all statements in a document he or she signed, presumes the signing defendants' scienter). Accordingly, Plaintiffs may not rely on the alleged falsity of the financial statements to demonstrate Defendants' scienter.[11]

---

the Special Committee"); *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1241 (N.D. Cal. 1994) (noting that "mere membership on committees of a corporation's Board of Directors is . . . insufficient to subject an outside director to liability").

[11] Plaintiffs allegations of reliance and loss causation appear to be adequate. In a derivative action, Plaintiffs must allege that the company relied to its detriment on Defendants' allegedly false statements or omissions. Defendants argue that because the allegedly fraudulent backdating predated each corresponding SEC filing, the company cannot have relied on statements in these filings in granting options. However, as in *Zoran*, "[b]ecause the Company provided the shares in exchange for the artificially low prices set by Defendants, it relied on false statements regarding their value and compliance with the plans." 511 F. Supp. 2d at 1012.

With respect to loss causation, Plaintiffs allege that the "improper backdating, which violated the terms of the Plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the option recipient defendants and improperly

18

**B.      Section 20(a) claims**

A prima facie case under § 20(a) consists of showing (1) "a primary violation of federal securities law" and (2) "that the defendant exercised actual power or control over the primary violator." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000)). "Control person liability is secondary only and cannot exist in the absence of a primary violation." *Hulliung*, 548 F. Supp. 2d at 342 (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 383 (5th Cir. 2004)). Because Plaintiffs have failed to state a claim under § 10(b)–the only independent securities law violation they allege–they necessarily have failed to state to claim under § 20(a). Accordingly, Plaintiffs § 20(a) claim will be dismissed.

**C.      State-law claims**

Plaintiffs allege several claims under California law against both the Officer and Director Defendants. While courts may exercise supplemental jurisdiction over state-law claims "that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," 28 U.S.C. § 1367(a), a court may decline to exercise supplemental jurisdiction where it "has dismissed all claims over which it has original jurisdiction," *id.* § 1367(c)(3). Indeed, unless "considerations of judicial economy, convenience[,] and fairness to litigants" weigh in favor of the exercise of supplemental jurisdiction, "a federal court should hesitate to exercise jurisdiction

---

reduced the amounts they had to pay the Company upon exercise of the options." SAC ¶ 151. In light of the allegations of backdating, this allegation is adequate. As the court found in *Zoran*,

> [s]imply put, the corporation was defrauded by [defendants], who caused it to sell stock to its officers and directors for less than the corporation was entitled to receive for those shares, at least as to the options exercised. As to unexercised options, Zoran was defrauded by [these defendants] by causing it to award options of more value to the recipient than authorized. These options were outside all plans and could have ordinarily fetched a higher price in the market. *For both exercised and unexercised options, one damage item caused by the transaction was the loss to the corporation*.

511 F. Supp. 2d at 1012 (emphasis added).

over state claims." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) ("[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity."); *accord City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156 (1997).

Because it remains unclear whether the instant action contains any viable federal claims, the Court will defer its ruling on Defendants' motions with respect to the state-law claims in order to permit a more complete assessment of whether the exercise of supplemental jurisdiction over any of the state-law claims would be proper. *See Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) (en banc) (noting that "state law claims 'should' be dismissed [pursuant to § 1367(c)] if federal claims are dismissed before trial") (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

## IV. CONCLUSION

For the foregoing reasons, the Director Defendants' motion to dismiss will be granted with respect to Plaintiffs' federal claims. Because it is not clear that Plaintiffs cannot state a viable federal claim, leave to amend will be granted, and any amended pleading shall be filed not later than thirty days from the date of this order. The Court will defer its ruling on the Director and Officer Defendants' motions to dismiss the state-law claims until such time as the Court determines that Plaintiffs either have stated or will not be able to state a federal claim.[12] The Court also will defer its ruling on SSTI's motion to dismiss for failure adequately to plead standing or demand futility.

**IT IS SO ORDERED.**

---

[12] Nonetheless, as the Court noted at oral argument on the instant motions, Plaintiffs' allegations with respect to the Officer Defendants appear to be so sparse as to press against the boundaries of proper pleading under Rule 11. Plaintiffs should consider seriously whether to re-plead these allegations.

20

DATED: 7/7/09

_____
JEREMY FOGEL
United States District Judge

This Order has been served electronically upon the following persons:

Aaron Franklin Olsen     aolsen@cooley.com, chourani@cooley.com

Alan R Plutzik     aplutzik@bramsonplutzik.com

Betsy Carol Manifold     manifold@whafh.com

Eric L. Zagar     ezagar@sbtklaw.com, der_filings@sbtklaw.com, kpopovich@sbtklaw.com, rwinchester@sbtklaw.com

Eugene S. Litvinoff     elitvinoff@mwe.com, aleonetti@mwe.com

Howard S. Caro     hscaro@hhlaw.com, esvanbourg@hhlaw.com, kwong@hhlaw.com, mdewers@hhlaw.com

Jessica Lee Canepa     jcanepa@mwe.com, clovdahl@mwe.com

Kathryn Anne Schofield     kschofield@bramsonplutzik.com, moldenburg@bramsonplutzik.com

Kristi Kaye Elder     kelder@hhlaw.com

Lawrence Timothy Fisher     ltfisher@bramsonplutzik.com, moldenburg@bramsonplutzik.com

Matthew J. Jacobs     mjacobs@mwe.com, aleonetti@mwe.com

Monique R. Sherman     invalidaddress@invalidaddress.com

Nichole T. Browning     nbrowning@sbtklaw.com

Norman J. Blears     njblears@hhlaw.com, dmsalvi@hhlaw.com, kelder@hhlaw.com, kwong@hhlaw.com, lasoboleva@hhlaw.com, laweiss@hhlaw.com, mjclouse@hhlaw.com, rbuehler@hhlaw.com

William S. Freeman     freemanws@cooley.com, galancr@cooley.com

Case No. C 06-4310 JF (RS)
ORDER RE MOTIONS TO DISMISS
(JFLC3)